Tommy BENSON, Appellant,

v.

GRIFFIN TELEVISION, INC., d/b/a KWTV Channel 9 and Bob Mosely, Appellees.

No. 50403.

Court of Appeals of Oklahoma, Division No. 1.

June 20, 1978.

Rehearing Denied July 25, 1978.

Certiorari Denied March 26, 1979.

Released for Publication by Order of Court of Appeals March 29, 1979.

Paul Pugh and Al Pugh, and Kade A. McClure, Oklahoma City, on the brief, for appellant.

Andrews, Mosburg, Davis, Elam, Legg & Bixler, Inc. by Robert D. Nelon, Roy J. Davis, Oklahoma City, for appellees.

ROMANG, Judge:

Plaintiff sued the Defendant television station (Station) for a defamatory broadcast of the following statement concerning a local bank robbery:

". . . F.B.I. agents and Highway Patrolmen converged on the home of . . . [Plaintiff], but found only one man at the home who claimed he didn't know . . . [the Plaintiff] or his whereabouts."

The District Court granted the Station's motion for a summary judgment and Plaintiff appeals.

■ Rule 13, Rules for District Courts, authorizes the District Court to grant a judgment where "the depositions, admissions, answers to interrogatories, and affidavits on file . . . show that there is no substantial controversy as to any material fact." It should be denied ". . . if reasonable men, in exercise of fair and impartial judgment, might reach different conclusions from undisputed facts concerning any issue as set forth in such instruments." *Weaver v. Pryor Jeffersonian,* 569 P.2d 967, 973 (Okl.1977). It has not been expressly settled whether allegations in a pleading, unsupported by a deposition, admission, answer to interrogatory or affidavit, may be considered in ruling on such a motion. It would seem not. In *Weeks v. Wedgewood Village, Inc.,* 554 P.2d 780 (Okl. 1976) the Supreme Court said "[m]otions for summary judgment do not admit all the well-pleaded facts in a petition." While *Weaver, supra,* at 973 speaks of "pleadings and affidavits," it is clear that the Court was referring to "facts concerning any issue raised by the pleadings . . ." and not facts *alleged* by the pleadings. Even so, all reasonable inferences from the depositions, admissions, answers to interrogatories and affidavits shall be made against the movant to determine if material facts are in controversy.

The essential issue raised by the facts is whether the Station acted with due care or under a qualified privilege in publishing the above statement which, for purposes of this appeal, is taken as false and defamatory *per se.* The Station argues that a qualified privilege exists for the news media and that no material issue of fact remains for jury consideration. Plaintiff contends that the negligence standard of *Martin v. Griffin Television, Inc.,* 549 P.2d 85 (Okl.1976) precludes any qualified privilege and presents a material issue of fact on which reasonable men might draw different conclusions. Since we are presented with a pure issue of law, no deference to the District Court's decision is required.

Both parties agree, as they must, that in *Martin, supra,* the Supreme Court reformulated Oklahoma's standard of liability for actual harm caused a private individual by a defamatory statement in the light of *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The Court balanced the interest in providing compensation to private victims of defamatory falsehoods against the broader interests in truth established in the freedom of the press and speech guaranteed by the First Amendment to the U. S. Constitution and Art. II, § 22 of the Oklahoma Constitution, and concluded that "a reasonable balance between the right of the news media and the right of the private individual is best achieved by the negligence test." *Martin, supra,* at 92.

The Station argues that nothing in *Martin* precludes the continued recognition of a qualified privilege as accepted in such cases as *Beshiers v. Allen,* 46 Okl. 331, 148 P. 141 (1915); *German-American Ins. Co. v. Huntley,* 62 Okl. 39, 161 P. 815 (1916); *Bland v. Lawyer-Cuff Co.,* 72 Okl. 128, 178 P. 885 (1918); *Johnson v. Inglis,* 190 Okl. 316, 123 P.2d 272 (1942); and *Reininger v. Prickett,* 192 Okl. 486, 137 P.2d 595 (1943). We need not decide whether these cases remain viable since the Station admits they do not directly support the qualified privilege claimed. In *Hubbard v. Cowling,* 36 Okl. 603, 129 P. 714, 715 (1913) our Court said:

"[w]here a communication is made by one having a duty ᵗo perform, and it is made in good faith, in the belief that it comes within the discharge of that duty, it is privileged . . ., and the duty here

referred to is not limited to legal obligations, but extends to moral or social duties of imperfect obligation."

The Station apparently desires us to recognize a qualified privilege in the news media to be protected from liability for falsehoods published or broadcasted in good faith by the media as to news events on the ground that such occurs in the fulfillment of a "moral or social" duty. We are cited to three primary authorities as directly in point, *Beyl v. Capper Publications,* 180 Kan. 525, 305 P.2d 817 (1957); *Stice v. Beacon Newspaper Corp., Inc.,* 185 Kan. 61, 340 P.2d 396 (1959); and *Glenn v. Gibson,* 75 Cal.App.2d 649, 171 P.2d 118 (1946). See also *Coleman v. MacLennan,* 78 Kan. 711, 98 P. 281 (1908).

The Kansas cases have established a common law qualified privilege for the news media based on the lengthy analysis in *Coleman v. MacLennan, supra.* As stated in *Gobin v. Globe Publishing Co.,* 216 Kan. 223, 531 P.2d 76 (1975), a post-*Gertz* case, "[e]ven though a statement complained of be false, if it is qualifiedly privileged, it must be made with malice before it is actionable." *Gobin, supra* at 80. The effect of the qualified privilege in Kansas is to rebut the common law inference of malice based only on falsity. See *Stice, supra* at 400. Since malice is not required for a private person to recover under *Martin* the effect of the adoption of the Kansas position, when combined with *Martin,* is to convert the qualified privilege into an absolute defense unless the private plaintiff can plead and show malice or reckless disregard for the truth. The consequence is to place on the private plaintiff the same burden shouldered by a public official under *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).[1]

The Restatement of the Law, Second, Torts (A.L.I. 1977) supports the balancing process developed by *Martin.* See §§ 594 and 595. In an identical comment to these two sections the drafters remark as follows on the effect of *Gertz* on the conditional or qualified privilege:

"Another significant consequence of all this is that the courts will now find it necessary to reassess the circumstances under which it is appropriate to grant a conditional privilege. If a proper adjustment of the conflicting interests of the parties indicate that a publisher should be held liable for failure to use due care to determine the truth of the communication before publishing it, a conditional privilege is not needed and should not now be held to apply. The conditional privilege should be confined to a situation where the court feels that it is appropriate to hold the publisher liable only in case he knew of the falsity or acted in reckless disregard of it." Restatement 2d, § 594 comment b and § 595 comment b.

The Station has suggested that the claimed qualified privilege is analogous to the privilege a citizen enjoys in reporting matters concerning alleged criminal conduct to the authorities. See *Johnson v. Inglis, supra,* and *Beshiers v. Allen, supra.* But this traditional privilege to report matters to public authorities has not generally been expanded to encompass a report of a criminal investigation to the "world at large." See Prosser, Handbook of the Law of Torts p. 792 (4th Ed.1971).

■ Our reading of *Martin* leads us to the conclusion that our Supreme Court has balanced the public interest in the free flow of information and the public interest in protecting a private individual injured by defamatory material and has struck the scales by requiring the Station to meet the standard of ordinary care. This standard is defined as "that degree of care which ordinarily prudent persons *engaged in the same kind of business* usually exercise under similar circumstances . . . ." *Martin, supra* at 92 (Emphasis added). It must be emphasized that this standard requires the recognition of the peculiar needs of the

1. We do not find the California case cited persuasive since it relied heavily on the Court's construction of the California Civil Code.

electronic and printed media. *Gertz*, 418 U.S. at 340–341, 94 S.Ct. 2997, noted the need to avoid self-censorship by the media. The need to report matters as quickly as possible is not merely good competition but serves a paramount concern of society to have access to information of public concern as soon as possible. These considerations, as well as others to be developed by the facts, are relevant in determining the standard of care for the media in reporting about private persons. Sensitivity to the importance of the two values here in conflict will lead the trial courts to avoid abstract instructions that do not adequately focus on the peculiar needs of the media.

■ Negligence being the standard what can be said about the instant summary judgment? The real controversy centers on whether the Station's reporter had a reasonable basis for his report that implicated the Plaintiff in a crime. A review of admissions, answers to interrogatories and affidavits shows that the Plaintiff was not involved. The reporter's affidavit indicates that a sheriff's deputy "told the FBI agent that the description of one of the suspects fit that of  .  .  .  [the Plaintiff];" that when authorities "converged on a house where another car suspected to be connected with the robbery was parked  .  .  . [t]he man answering the door was asked by one of the law enforcement authorities, 'Is  .  .  . [the Plaintiff] here?'" On inquiry of an "investigative official" the reporter was told that the house was that of the Plaintiff. An affidavit submitted by the Station from a member of the sheriff's posse indicated that the affiant had been told by a person that the Plaintiff had been seen in a car matching the description of a car suspected of being used in the robbery and that he gave this information to the FBI. While stating in one affidavit that he considered the Plaintiff to be a suspect, the affiant in a separate affidavit does not mention the Plaintiff. Another affidavit, submitted by the Plaintiff, by the then Chief of the Guthrie Police Department, indicates that the Plaintiff's name came up during the investigation but that the affiant does not recall who brought it up and that he at no time considered the Plaintiff a suspect. Other affidavits also deny that Plaintiff was a suspect.

Whether or not Plaintiff was a suspect, we find no fact in dispute which is material to the alleged defamation. The Plaintiff's name was mentioned and at least some law enforcement officials thought it was the Plaintiff's house they were visiting. The report on the air, although erroneous, reasonably reflects what a reporter could have concluded based on the undisputed facts. The reporter noted what he observed, was reasonably faithful to those observations, and displayed no indifference or negligence regarding their accuracy. We do not believe that reasonable minds, applying the standard of ordinary care for the business of television broadcasting, could reach a conclusion other than the one reached by this Court and the court below. On this record the Station and its reporter exercised due care. We affirm the trial court.

AFFIRMED.

BOX, P. J., and REYNOLDS, J., concur.