Hillsborough,
Feb. 5, 1929.

ROMAN W. SLOCINSKI *v.* FRANCISZEH RADWAN.

SAME *v.* FRANK STEC.

SAME *v.* STANLEY KROLIKOWSKI.

FRANCISZEH RADWAN *v.* ROMAN W. SLOCINSKI.

*Maurice F. Devine* and *John E. Tobin* (*Mr. Tobin* orally), for Slocinski.

*Osgood & Osgood* (*Mr. Anson G. Osgood* orally), for Radwan, Stec and Krolikowski.

BRANCH, J. 1. The plaintiff's evidence tended to prove that all three of the defendants circulated reports that he had been guilty

of criminal conduct with women and girls in other places. The defendants denied using much of the language attributed to them, but they placed their chief reliance upon the defence of privilege. They claimed that most of the statements which they had made embodied information which had come to them in documentary form from sources which appeared to be reliable; that these statements were addressed in every instance to fellow members of the Holy Cross congregation, and that in attempting to expose the alleged disqualifications of the pastor they acted without malice, solely for the benefit of the parish. In this situation, the court charged the jury as follows: "What I am going to give you in regard to the law, as to qualifiedly privileged communications, Mr. Foreman and gentlemen, I wish you to remember distinctly. It does not apply to these imputations which include the commission of a crime and for which the plaintiff could be prosecuted, such as being a thief or being with women, or having children by women in other parishes, etc., these communications, if made, can never be privileged. Consequently, when I talk about communications qualifiedly privileged, I talk about communications or accusations which might disqualify the Bishop here as Pastor of the Parish, but falling short of the commission of a crime. . . . I repeat if these statements were made and published of another, they are allegations of crime and would be actionable per se and would not be privileged."

These statements of the law were clearly erroneous, as the plaintiff concedes. "In the absence of malice an utterance may be qualifiedly privileged, even though it is not true, and notwithstanding the fact that it contains a charge of crime." 17 R. C. L., Tit. Libel and Slander, s. 88; *Moore* v. *Butler*, 48 N. H. 161, 165; *Lafferty* v. *Houlihan*, 81 N. H. 67.

The destructive effect of this erroneous charge upon one of the most important contentions made by the defendants is obvious, but the plaintiff argues that they were not harmed by it because, upon another ground, the claim of privilege was untenable. His position is thus stated in his brief: "If these defendants had any right whatsoever to publish the statements that they did concerning the plaintiff, that right existed only at a duly called meeting of the committee and/or of the parish where an established tribunal had some duty to perform, some power of action in relation to the charges against the pastor. . . . In order to benefit by the doctrine of privileged communication, the defendants must show, that derogatory statements were made at a place properly established for the purpose of hearing

the charges and in accordance with the uses and discipline of that particular Church."

The above propositions are unsound. There is no rule of law which limits the occasion when church members may, without liability for slander, discuss among themselves the qualifications of their pastor to committee meetings or parish gatherings. On the contrary, such discussions are governed by the general rule that "a communication made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which, without this privilege, would be actionable, and although the duty is not a legal one, but only a moral or social duty of imperfect obligation." 17 R. C. L., Tit. Libel and Slander, s. 88; *Moore* v. *Butler*, 48 N. H. 161, 166; *State* v. *Burnham*, 9 N. H. 34; *Shurtleff* v. *Stevens*, 51 Vt. 501; Bower, Defamation (2d *ed.*), 116, 117; Odgers, Libel and Slander (5th *ed.*), 280. "If *fairly* warranted by any reasonable occasion or exigency, and honestly made, such communications are protected for the common convenience and welfare of society; and the law has not restricted the right to make them within any narrow limits." Baron *Parke* in *Toogood* v. *Spyring*, 1 C. M. & R. 181. It is to the general interest of society that correct information shall be obtained as to the character of persons in whom others have a common interest, and hence the law grants to all the privilege of giving information concerning private individuals when given *bona fide* and to a person having a corresponding interest in the subject. *Shurtleff* v. *Stevens, supra.* The law lays down sound, practical rules which, while they give no countenance to defamation, protect all in publishing, upon lawful occasions, "what they have reason to believe the truth, if it is done with motives which will bear examination." *State* v. *Burnham*, 9 N. H. 34, 46.

It is hard to imagine a more obvious example of common interest than that which is shared by the members of a church in the character and conduct of the minister, since these factors determine his capacity for spiritual leadership. No minister can expect, nor should he desire, that the question whether he measures up to the standards of behavior or ability demanded by his parishioners will not be debated in private conversations by members of his congregation. More often than otherwise, such discussions tend to enhance his prestige and increase his influence, but in any event they constitute the raw material out of which the prevailing sentiment of the parish in regard to the useful-

ness of the preacher is evolved. This is the normal way in which public sentiment upon any matter of common concern is developed.

The idea that the conduct of a minister should be mentioned unfavorably only at church meetings, or before tribunals having authority in the premises, suggests an undesirable departure from the usual course of events. Charges against clergymen publicly made before church bodies are happily the exception rather than the rule. Individual church members are not accustomed to bring the various items of gossip which may be in circulation about the minister to the attention of the governing boards of the church, nor is it desirable that they should do so. The high esteem in which clergymen are usually held by their parishioners furnishes a substantial guarantee that discreditable rumors, if without substantial foundation, will die a-borning. The comparatively rare instances in which charges are presented and heard by the constituted church authorities evidence the culmination of considerable periods of private discussion amongst the members of the congregations involved. Any rule designed to penalize the formation of public sentiment in such cases by arresting the preliminary sifting of reports through private discussion, free from the taint of malice and for a proper purpose, is without justification and would be foredoomed to practical failure as an attempt to decree that men and women shall not act like human beings.

Cases involving the present factual situation appear to be rare. No decision holding that the privilege does not cover private communications between church members in regard to the qualifications of the minister has been cited. Three cases, in other jurisdictions, have been found, however, in which statements regarding clergymen made by members of their congregations to others having a common interest were held to be qualifiedly privileged, *i. e., Pendleton* v. *Hawkins*, 11 App. Div. 602; *Blackburn* v. *Blackburn*, 4 Bing. 395; *Hopwood* v. *Thorn*, 8 C. B. 293. Analogous cases are not infrequent. Thus, the publication in denominational journals of the results of disciplinary action against clergymen is privileged. *Shurtleff* v. *Stevens, supra; Redgate* v. *Roush*, 61 Kan. 480. A letter from one clergyman to another regarding a member of the latter's congregation was held to be privileged in *Whiteley* v. *Adams*, 9 L. T. R. (N. S.) 483, and the privilege was held to cover a communication to a clergyman from a member of a sister church relative to another minister who was advertised to preach in his church, in *Clark* v. *Molyneux*, L. R. 3 Q. B. D. 237. The same rule was also applied to a communication between members of a society pledged to maintain good morals

amongst its adherents regarding the conduct of a third member, in *Kersting* v. *White*, 107 Mo. App. 265. The privilege also extends to communications between members of fraternal orders in regard to the qualifications of fellow members and applicants for membership. Note to *Berot* v. *Porte* (144 La. 806), in 3 A. L. R. 1651, 1654; *Cadle* v. *McIntosh*, 51 Ind. App. 365; *Streety* v. *Wood*, 15 Barb. 105. In the same way communications between the stockholders of a corporation in regard to corporate matters are qualifiedly privileged. 17 R. C. L., Tit. Libel and Slander, s. 108; *Chambers* v. *Leiser*, 43 Wash. 285; *Quartz Hill &c. Co.* v. *Beall*, L. R. 20 Ch. Div. 501.

We therefore conclude that the instructions of the court which denied to the defendants the benefit of the doctrine of conditional privilege with reference to statements imputing criminal conduct to the plaintiff were not only erroneous but highly prejudicial to their rights, and require the granting of a new trial.

2. From the foregoing discussion, it is also apparent that the court erred in giving to the jury the following instructions: "Therefore, if there was a proper tribunal or place to which the defendants could have presented their charges against the Bishop, and the defendants made defamatory statements to others than members of the proper tribunal and at places outside of that established for the purpose of receiving these charges, the defendants' statements are not privileged. And whether the statements were made in the proper place, or whether there was a place where they should be made, is for you to determine upon all the evidence in the cases. If the defamatory remarks alleged to have been uttered concerning the plaintiff were made on the street, in the homes of private individuals or at other places than that established to hear these charges the statements are not privileged." In this case the trial judge followed the unhappy practice of reading to the jury, with occasional comments, the requests of both parties, after his own statement of the law had been completed and the above quotation embodied two of the plaintiff's requests. Other portions of the charge were wholly inconsistent with the propositions therein set forth, and the net result in the minds of the jurors must have been extreme confusion. We heartily approve the following pronouncement of the judicial council of Connecticut: "It [a charge] should contain a simple, comprehensive and clear statement of the law applicable to the material issues of the case. Having thus presented the issues involved the judge should not read and comment upon requests to charge covering the same issues. The court is never required to charge in the language of requests." First report of the Judicial

Council of Connecticut, 1928 (Connecticut Public Document No. 79), 42.

3. There was testimony that the defendant Krolikowski said that the plaintiff "was no priest"; and that he was "married and had children." For the apparent purpose of showing that these statements were made in good faith, the defendants introduced testimony that one John Dziak had shown to Krolikowski a letter from a priest in Albany, New York. The letter was then offered in evidence and excluded. In it were recited facts which tended to sustain both of the above statements attributed to Krolikowski. As tending to show that he had probable cause for believing them to be true, the letter was material (*Carpenter* v. *Bailey*, 53 N. H. 590) and its exclusion was therefore error. *Bradley* v. *Heath*, 12 Pick. 164; *Commonwealth* v. *Clap*, 4 Mass. 163.

4. For the purpose of showing in part the basis for their belief that the plaintiff was married and had children, the defendants introduced in evidence a birth certificate signed by the deputy registrar of vital statistics of the city of St. Louis certifying the birth of one Roman Walter Slocinski upon February 3, 1920, and giving the father's name as "Roman" and the mother's as "Agnes." In rebuttal, the plaintiff was permitted to introduce in evidence a copy of a judgment in his favor for the sum of $100 entered by agreement in the circuit court of the city of St. Louis upon November 5, 1925, against one Agnes Rapski. It was certified under the seal of the court by its clerk, but not otherwise authenticated, and no copies of any other portions of the record were included. It seems to have been conceded that the Agnes Rapski referred to in this judgment was the "Agnes" mentioned in the birth certificate.

The admission of this copy was erroneous for a variety of reasons. It did not purport to be a complete copy of the proceedings in the St. Louis court, and did not, in fact, disclose the nature of the action. It was not properly authenticated and was therefore inadmissible. *Folsom* v. *Blood*, 53 N. H. 434; *State* v. *Blaisdell*, 59 N. H. 328. Even if it had been properly proved the judgment was only binding upon the parties to it, and was not evidence against the defendants of the facts therein adjudicated. *Genest* v. *Company*, 75 N. H. 365, 368, and cases cited.

Before the record was admitted the plaintiff had testified to the bringing of a suit against Agnes Rapski and the recovery of a judgment against her. To this testimony the defendants objected but did not except. It is now argued that the copy of the judgment was

admissible to corroborate this testimony. There is no merit in this suggestion. Since the proceedings against Agnes Rapski had no binding force upon the defendants, and since a judgment is properly provable only by the record thereof, the plaintiff's testimony was not admissible and should have been excluded. The fact that this testimony went in without exception did not justify the admission of other incompetent evidence to corroborate it.

The plaintiff further argues that the inclusion of his name in the birth certificate "was done at the instance of Agnes Rapski" and that the judgment record was admissible as a repudiation by her of the statement contained therein. Without intimating that this argument is otherwise meritorious, it is sufficient to say here that it fails because the evidence reported does not sustain the allegation that Agnes Rapski furnished to the department of public welfare of the city of St. Louis the information which appears on the birth certificate.

5. The motion of the plaintiff Radwan for a new trial in the fourth action was based upon the ground that the jury must have been influenced in their verdict by the foregoing evidence which was improperly admitted and by the errors in the charge, which have been considered. If the ruling of the court denying the motion was based upon a finding that the matters complained of did not affect the verdict, that finding cannot be disturbed here and the exception must be overruled. *Wilcomb* v. *Duston*, 82 N. H. 180; *Lavigne* v. *Lavigne*, 80 N. H. 559. The ruling of the court may have been based, however, upon the ground that these matters had not then been authoritatively declared to be errors and in the light of the conclusions which have been reached above, a renewal of the plaintiff's motion in the superior court would not be improper.

*In the first three cases, new trial: in the fourth case, plaintiff's exception overruled.*

All concurred.